Thank you, Your Honor. My name is Stephen Volker. If it pleases the Court, I am here today on behalf of Appellants Protect Our Communities Foundation, et al., in a matter involving the Forest Service's decision to allow 19 miles of a high-tension power line to cross the Cleveland National Forest. I'd like to reserve five minutes for rebuttal, if I might. Manage your own time, though. Manage your own time, though. Yes, thank you. This case involves a severe disconnect between what the public was told in the environmental review process and what the agency ultimately approved. We have an EIS that addresses, in large measure, the proposed project, which had an alignment that stretched north of the Cleveland National Forest and east of the McCain Valley Recreation Area. And the project was changed after the draft EIS was circulated, and then it was changed again after the final EIS was circulated. The project was changed yet again, as reflected in the project modification report dated May 2010. Was that public? That was a public process within the State Public Utilities Commission process in May of 2010. It became a federal public document in September 2010. Was that the document that adequately described what was going to happen? It was not adequate in many respects, as we pointed out in comments on it, but the important point here is a matter of law. It was not an environmental review document under either NEPA or CEQA. It wasn't circulated to agencies as a supplemental EIS, which discussed impacts and provided an opportunity for experts and agencies to comment in the NEPA process and to have, under the NEPA guidelines, responses to their comments submitted. It was, rather, a relatively closed process, but it did not comport with either the circulation and review and response to comment provisions of NEPA and CEQA. As a result, the project that was approved has substantially greater impacts and many impacts that were never adequately evaluated than does the project that was described in the draft EIS. The draft EIS treats the original proposal with some detail. It provides a detailed summary of that proposal. It then explains, as to each segment of that proposal, its location relative to landforms and impacts and describes them in detail. It prompted responses from the public that were largely supportive, including responses from the plaintiffs, indicating that this was a sound approach to NEPA compliance and federal land management compliance. That was a good thing. Unfortunately, the process shifted from NEPA compliance to the polar extreme from that, which is to have the project description change in ways that, still to this day, are difficult to fathom. As we pointed out in our briefs, you might take a look, for example, in this case, in our reply brief, we provided a summary of the many different ways in which the project description is disjointed and internally inconsistent, such that it is impossible to know, as a member of the lay public, just where the project is located, much less what its impacts would be. That appears on pages 3 to 5 of our reply brief. You know where the route's going, correct? After the EIS was done, at the moment the EIS was certified, no. The route was changed dramatically after the October... No, I understand that. I'm just saying, as you stand here today, you know where the route's going, correct? Not because of anything that had to do with the NEPA documents. So the answer is yes, you know where it's going. I don't personally. I am aware that stakes have been placed and that it is possible, I would presume, to conduct surveillance of the staked and erected portions of the project. But the test under NEPA is not whether... No, but you also have maps in the record, true? The maps in the NEPA record do not show the locations of the finally adopted project. The finally adopted project, according to the PMR, varied up to one mile from the route set forth in the EIS. And there was no map in the EIS that disclosed those changes. It also moved the corridor from compliance with the Energy Policy Act of 2005. Section 368 of that directs that utility corridors should be located within the West White Energy Corridor. In this case, after these post-NEPA project changes were completed, we understand from the PMR, the Project Modification Report, which was not a NEPA document, that only 1.3 miles out of the 19 miles that the route occupies within the National Forest complied with the location within the West White Energy Corridor requirement. That is also a violation, as we point out, of FLIPMA. The Forest Service is subject to FLIPMA's Energy Corridor location requirements. 43 U.S.C. Section 1763 directs that federal agencies shall use rights-of-way in common to the extent practicable. And that has two applications here. The first is as to the southwest power link and existing high-tension power line from the eastern part of the county, from Imperial County, to the San Diego area. And this project is not co-located with that, except for about 30% of the project's length within Imperial County. And, as I indicated, it does not comply with the West White Energy Corridor location. Now, the other significant changes in the project post-NEPA compliance bear mention here. The project would employ infrared lighting on the towers, something that was not contemplated initially. Infrared lighting has adverse effects on bird collisions. It attracts birds flying at night. They collide and die. This is an immediately significant impact that was not addressed during the NEPA review process. The project occupies what has recently been designated as critical habitat for the royal toad. The EIS did not address that impact because, at that time, the royal toad's habitat had not been designated critical. But, at the end of the day, this isn't an appeal fully on the merits. It's an appeal from a preliminary injunction. And you have to not only show that you're likely to win, but the balance of equities tip in your favor. That's correct. And the balance of equities have an interplay with the merits. The balance of equities, historically or traditionally in the federal courts, takes into account the public's vital interest in assuring environmental compliance. And we have Saved the Yak and other cases explaining that. But winter has sort of changed the landscape and made it a lot more difficult for these preliminary injunctions to issue. I believe that that's correct. I concur. However, I hasten to add that this circuit has said repeatedly that the primary factor to be considered on a preliminary injunction is likelihood of prevailing on the merits. That's the sine qua non. I'm looking at the district court decision. And one of the factors that the district court highlighted was your delay in bringing the motion for a preliminary injunction. How do you respond to that? I would respond in several ways. We had timely sought summary judgment in the BLM litigation. That's the case to be heard next on the court's calendar. In December 2010. That was scheduled for hearing early the next year. It was February or March. The judge assigned to that matter after it had been fully briefed and we were expecting to have a decision on the merits well before any construction began, then recused himself. Then we went through a succession of federal district court judges, each of whom... Right. Yes. And it bears on this, Your Honor, for a number of reasons. First of all, we had sought to avoid needless waste of the court's and the party's resources by litigating the issues in the first case because, as we've seen, the adequacy of the EIS is central to the arguments that we were presenting. You're running out of time. So it makes a lot of sense to... You're running out of time. I gather your answer is things were happening in the other case and you didn't want to file it in this case. True? No, that's not true. There was no letter... Where are you leading with this? You've only got three minutes left. The question is, did you delay and was the judge right in so concluding? We certainly did not delay. We had a motion... The motion was filed on the eve of construction, right? We had a plumbering junction motion filed on April 16 in the other case, which would have stopped this project, and that was not heard by a federal court and decided until June 30. We promptly prosecuted an appeal from that ruling on July 1 and then have sought a succession of emergency motions for injunction on appeal, one of which your honors denied in the next month or two from that, and we have sought, I think, four or five different plumbering junction rulings at the district court and the circuit court level. So it shows the bottom line is you were diligent in the other case, and Judge Benitez said, you're not diligent in my case, and you could have been. So what's your response to that? I would say that we were diligent in both cases. He handled both cases, and all the parties proceeded with the expectation that the first case would, if litigated fully, eliminate the need for case number two. Now, let me ask you a different question because you're almost out of time. Are these ñ I gather that granting relief in either of these cases makes the other one moot. Is that your position? No. Granting relief in case number one, if on NEPA grounds, would set aside the decision by the Forest Service based on that EIS. So it was always clear that the second case would not have to be litigated if the first case were prosecuted fully and a final decision reached. Okay. I think I understand your answer. One more question. Is your major concern that the route changed from the FEIS and the EIR through the Supplemental Information Report and the final record of decision? Is that the real problem, the route changed? That was one of many problems we have articulated in detail in the briefs. I'm not going to agree that that's the only one or the only significant one, but it certainly was large. It's significant. Yes, it is. I mean, among the other changes, for example, if you're concerned about human health and safety, the change in the project ñ I'm asking about the route change. The route change resulted ñ The FEIS and the EIR contemplate minor changes, and what happened in the SIR and the ROD was that there were changes, but apparently that had to do with protecting habitat and visual concerns and all the rest. Is that correct? No, not at all. For example, the change in the route resulted in placing 3,217 structures at fire risk, whereas the originally proposed route only placed 1,380 at fire risk. That is a significant impact on the human environment never addressed in any NEPA document. Okay, may I reserve my 30 seconds then? No, you're actually over, but we'll give you a short period for rebuttal. Thank you. Okay. Do you have a time agreement? Yes, Your Honor, we do. I intend to speak for eight minutes on behalf of the Federal Government. Very good. Out of 15. May it please the Court. It is important, as this Court pointed out, to keep in mind the procedural posture of this case. It is an appeal of a preliminary injunction by contrast with the next appeal here. So the standard is abuse of discretion. And as this Court pointed out through its questioning of opposing counsel, the District Court made robust findings on the balance of harms and the public interest, neither of which the Court concluded favored the issuance of injunctive relief here. As the Supreme Court pointed out in Winter, those findings alone can be sufficient to uphold the denial of a preliminary injunction. Winter was actually, as you probably know, an injunction entered by the District Court that the Supreme Court reversed. But the same principle applies here. My colleague will go over in more detail the public interest and balance of the harms, but I do just want to highlight the three important public purposes. So let's get to the change of the route. Very well. And tell us about that and how it was communicated to the public. Well, it was communicated to the public through a supplemental information report prepared by the Forest Service. As a first matter, the utility prepared a decision modification report that it did put out for public comment. As opposing counsel noted, plaintiffs did submit public comments on that. Now, that's not something that's required to be subject to public comment under NEPA. The agencies then responded to that project change report, project modification report. The Forest Service did so by preparing a supplemental information report. Now, that is a non-NEPA document. Ordinarily, that's not made available to the public. And that's okay under the Supreme Court's case law and this Court's case law, so long as the agency is not arbitrary and capricious in concluding that the changes did not amount to significant new environmental information. And here, as the Court pointed out, the changes are really made in response to mitigation measures that were applied during the implementation and engineering phase of the project. And this relates to the claim about the clarity of the route description in the EIS. This is a complicated project. As I'm sure Your Honors know from looking at the record, it's a 117-mile transmission line. And the way these projects, whether it's a transmission line, a gas pipeline, or a highway project, get analyzed at the EIS level, the agency's task is to look at alternative corridors within which the facility might be placed. So, for example, here, across that 117 to approximately 150-mile segment of line, the agency was looking at more than two dozen alternatives. And it analyzes those in incredible detail in the EIS. But then to actually implement the project once it's selected that corridor, it has to go out and, during engineering, go to the actual site and lay out the project on the ground, applying the mitigation measures. And in that, ordinarily, it's not a challengeable action because it postdates the record of decision. It's not final agency action. It's challengeable. But where there are changes made, the agency still goes back and analyzes them, as it did here, to make sure that there's no significant new information that's occurred. Here, by and large, the net impact of the changes was to reduce the scope of the environmental impacts, reduce the acreage impacted, and reduce the number of mile of roads that were constructed on the Cleveland National Forest for this project. And ordinarily, those types of changes that are simply made in response to mitigation and serve to reduce the scope of impacts of a project will not trigger the need for a supplemental environmental impact statement. And is that the view the district court took of those changes? Yes, I believe that is, Your Honor. I'm not recalling the precise findings the court made on the merits on this issue. I mean, this court, of course, reviews the merits questions de novo based on the administrative record. But there were robust findings by the district court on the merits as well, with ample citations to the administrative record, and I commend that preliminary injunction decision to this court's reading for those citations. There's a table summarizing the modifications and impacts that we're talking about. There are tables in the supplemental information report as well, detailing the reason for each change. And in cases where the route moved by 100 feet, a few thousand feet, I think you have to keep in mind the scale of this project, approximately 117 miles. You're talking about moving the route a few hundred feet one direction or another, overall going to reduce impacts, and is made in response to a detailed suite of mitigation measures that are intended to avoid impacts to sensitive species, to cultural sites, and the like. I want to address, you know, and to point out the difference between this appeal and the merits of the BLM case. Really, the only unique claim on the merits in this Forest Service appeal that they're pressing to this court is the claim under NEPA that a supplemental EIS was required for the project. That claim is not in the BLM appeal, so that is really where the unique focus of this case is. There are several reasons why they say a supplement was required. I'd like to address three of them, co-location, infrared lighting, and their arroyo toad, if I have enough time to do that. The co-location argument they make with respect to two energy corridors, the west-wide corridor, which is specific to the Forest Service here, and the southwest power link. That argument is present in the other case. The west-wide corridor, it is displayed in the Supplemental Information Report where that route deviates slightly from the corridor. This is really a corridor that's designated on paper. It's determined by the agency on a multi-state level to be where generally these utilities ought to be placed, but there's no requirement, contrary to what Planning Council represented in the law, that it must be placed in that corridor. The Forest Service can't amend its plans as it did here to allow for the utility wanting to be placed outside the corridor. And here it did so in response to concerns to avoid sensitive species. That was legitimate. Infrared lighting, the main issue is the birds cannot see this infrared lighting. The infrared lighting was installed as a mitigation measure in response to concerns by the Bureau of Customs and Border Protection and the Department of Defense, both of which are interested in this project because of its proximity to the international border and because it crosses DOD lands. Those agencies are concerned about law enforcement operations being able to see the line at night  They did not install visible lighting so as to keep the nightscape that we see clear of any lights. But the infrared lighting can be seen with night vision goggles. That's a safety measure that was intended to mitigate for those effects. Birds cannot see infrared lighting, according to the analysis. And the EIS had already assumed that birds flying at night would collide with the power line and have significant environmental impacts. That does not change by the installation of infrared lighting. What the Forest Service and DLM did to respond to the concern that birds might congregate in areas near these lights where insects who can see the lights are attracted to them, and that might be some additional contribution to bird mortality, the agencies required SDG&E to install bird diverting devices near where the infrared lights would be installed. And what these are is little small cards basically that flap in low breezes and emit ultraviolet light even at night that the birds can see, and it helps them avoid the power lines. That's not significant new information that changes the picture of overall impacts because the visual impacts were already assumed to be significant in this regard. Finally, with regard to the Arroyo toad, the agencies already analyzed habitat for the toad and impacts to the habitat, described it as suitable habitat based on the Forest Service's habitat models. When the Fish and Wildlife Service proposed designating habitat as critical habitat, that simply changed the legal status of the habitat. It did not alter dramatically the scope of the acreage that was at issue. And so it was not significant new information that was required to be analyzed in a supplemental EIS. And unless the Court has any additional questions, I'm prepared to turn over my presentation. Thank you very well. Thank you. Good morning. Your Honors, at a cost of over $1.7 billion, Sunrise, Janice Schneider on behalf of San Diego Gas and Electric Company, Your Honor. Sunrise is now nearly complete. It's, in fact, in the process of being energized on the 230 portion of the line later today. On Forest Service lands, it's about 95% complete. On BLM lands, it's about 98% complete. All towers are erected, all roads are set in place, and there are four remaining wire poles that are now currently underway. All physical construction of the 500 kV portion of the transmission line is expected to be complete in about a week by about June 14th. And we currently estimate that the operational control of the line will be taken over by the California Independent System Operator, the CalISO, a couple of days later by June 16th. This is consistent with state law requirements and the FERC-approved transmission control agreement. I'm happy to answer any questions. What does all of that mean? What it means, Your Honor, is that we believe the preliminary injunction case will be moot in just a matter of days, and we think it's important for the court to have that information to take into consideration as it decides how to do it. Because there will be nothing to enjoin. That's correct, Your Honor. You know, within a few days, there will be nothing to enjoin. The question in front of the court, of course, is did the district court abuse its discretion in granting the preliminary injunction? And once... I think you mean denying. Excuse me? In denying. I'm sorry. Thank you very much. In denying the preliminary injunction. And once the activity complained of in the motion is complete, then that question does become moot, Your Honors. And what happens to the case? The preliminary injunction case would be moot. You mean the underlying case? The underlying case. Yeah, that's an interesting question. Yes. That's a very interesting question. Well, you know, I mean, we acknowledge this Court's precedent on mootness, going back to the Schlesinger case. We actually do think that there are some strong contrary views of that case law, including in Your Honor's presentation in the dissent in the West decision, as well as numerous circuit courts who would argue that... Right. But it was a dissent. It was a dissent. I grant you that. I grant you that. But... I still think I was right. Right. And I agree. I think you're right as well. And, in fact, five other circuits would agree with your analysis here, too. Right. And we are bound by circuit precedent. I agree, Your Honor. And I think our position would be that this is a very good case to perhaps consider reconsidering that precedent over time. We're missing a number of judges to do that. I understand, Your Honor. We just want to get it in the record in case. We need to go there. I know there's some in the building. It's of no moment here. It was just an atmospheric. Yeah. Yeah. But so in any event... So I guess the bottom line is under circuit precedent, with which you strongly disagree, it's probably not moot. That's correct, Your Honor. The underlying merits. But that's not to say that I won't file a motion for mootness in about a week or so. Well, and it may be practically moot in a certain sense. Well, that's exactly right. In West, for example, I guess there were some things left, although to me I thought it was moot. Right. Right. Well, NEPA is a forward-looking statute. Right. And so once the project is substantially complete, then there really is no effective relief, I think. Well, after you commence operation, is there any permitting yet to be required? No. Yeah. No. I mean, the type of work that would be ongoing would be primarily some cleanup work, some safety-related work, making sure the foundations are correctly in place, et cetera, as well as primarily additional environmental restoration work, which we're required to do under the mitigation measures. This is of no moment either, but I've heard the author of all these statutes say, All I wanted to do was for people to take a hard look at these things. Right. I had no idea what a hard look was going to turn into. Well, that's exactly right, Your Honor. It seems to me that hard looks, lots of them were taken at this project. Yeah. I agree with that, Your Honor. And when you look at the merits on the case, I think it's a pretty straightforward case. Here, SDG&E proposed a route that was 150 miles long. It ran to the north. The agencies reviewed that proposed project. They looked at almost 100 alternatives, 27 in detail. They issued a draft environmental impact statement. They issued a supplemental draft environmental impact statement. They issued a final environmental impact statement. And they took public comment at every step of the way. There were thousands and thousands of people involved in this process. The agencies responded to those public comments and actually made revisions to some of the routing in response to the comments. As a result of the process, the project is 30 miles shorter and has far fewer environmental impacts. I mean, this is a perfect example of where NEPA actually worked, and it worked well. There's no change in the routing, as counsel suggested. As the government indicated, those minor revisions were done in compliance with mitigation measures, and all of them were done to reduce environmental impacts. So this, I think, is a great example of where NEPA actually worked. And as a result, we see significant decreases in the environmental impacts of this project. Now, kind of going back to the question in front of the court, because we do have about a week before the case becomes moot, the question in front of the court is very simple. Should society tolerate some level of environmental impact to have the significant benefits that Sunrise would bring? I thought the question was whether the district court abused its discretion. Well, there's that, too. That always gets my next talking point, Your Honor. That's my next talking point. So we think that the district court did not abuse its discretion, that it properly found that the public interest in the balance of equities in clean and reliable energy far outweighs the harms here. And I see that my time is out. I'm happy to answer any questions the court may have. Any further questions? No. Thank you very much. Thank you, Your Honor. I'll give you two minutes for rebuttal. Stick to it, please. Thanks. I apologize to the court about my error on birds seeing the infrared light. I recall that it caused collisions. The interrelationship is that insects are attracted and the birds are attracted to the insects. That led the Fish and Wildlife Service to state on the record that this was a significant impact that had not been addressed in the record previously. The citation for that was in Excerpts of Record, Volume 4, page 779. And the Forest Service said, quote, adding lights to most or all towers is likely to significantly increase the risk of collisions with migrating birds and could increase effects on bats. So that is a fact. That is a significant new impact that was not addressed previously. I wanted also to refer the court to 43 U.S.C., Section 1763. Mr. Toth suggested that there was not a mandatory duty on the part of federal agencies to co-locate, that is to use existing utility corridors where designated to avoid the unfortunate result of having multiple pathways through public lands, each with its own utility line, which fragments habitat and unnecessarily increases impacts. The statute makes clear that it is a mandatory duty. It uses the term shall. It says, in order to minimize adverse environmental impacts and the proliferation of separate rights of way, the utilization of rights of way in common shall be required to the extent practical. There was no evidence in this case that it was not practical to comply with the west-wide energy corridor boundaries, and additionally there was no evidence that it was not feasible or possible to co-locate with the southwest power link. We've explained that in our briefs. Finally, I wanted to respond briefly to Ms. Schneider's assertion that this case becomes moot if the project is energized. That's not the case. Under the Crook Tribe v. U.S. Forest Service decision that this court handed down on Bonk on June 1st, an environmental case such as this one does not become moot if any effective relief may be granted, and we have pointed out that because the EIS did not adequately evaluate a number of alternatives, including undergrounding and alternative routes, that those mitigations could still be achieved even after the project is built to avoid long-term impacts and avoid the catastrophic wildfires that we've seen induced by power lines in San Diego County, the Wyche fire, the Pines fire, these are all fully documented in the record in the last decade due to power lines. Thank you, counsel. I close. Thank you. Now you're going to argue the next case too, so do you want to stay up there or do you want to gather some more material? I'll grab another binder. Thanks. The case will be submitted for decision.
judges: Duffy, Trott, Thomas